UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KEVIN RATEMO et al.,<br>    Plaintiffs,<br>        v.<br>ISLAMIC REPUBLIC OF IRAN et al.,<br>    Defendants. | Civil Action No. 19-2067 (JDB) |
| JOSEPH KAZUNGA KATANA et al.,<br>    Plaintiffs,<br>        v.<br>ISLAMIC REPUBLIC OF IRAN et al.,<br>    Defendants. | Civil Action No. 19-2068 (JDB) |
| PRUDENCE BUSHNELL et al.,<br>    Plaintiffs,<br>        v.<br>ISLAMIC REPUBLIC OF IRAN et al.,<br>    Defendants. | Civil Action No. 22-646 (JDB) |

**MEMORANDUM OPINION**

In August 1998, truck bombs detonated simultaneously outside the United States embassies in Kenya and Tanzania. See Opati v. Republic of Sudan, 590 U.S. 418, 420 (2020). "Hundreds died, thousands were injured," id., including many U.S. citizens, government employees, and contractors, Owens v. Republic of Sudan, 864 F.3d 751, 762 (D.C. Cir. 2017), vacated and remanded sub nom., Opati, 590 U.S. 418. Litigation occupying the intervening decades has attributed these tragedies to the terrorist group al-Qaeda, operating with the support of Iran. Id.[1]

---

[1] Sudan shared responsibility but is no longer designated as a state sponsor of terrorism and is not a defendant in this case.

1

That litigation has settled most of the legal questions arising from the bombings—for instance, al-Qaeda's responsibility, Iran's liability, and this Court's jurisdiction. See Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 147–51 (D.D.C. 2011). These cases—brought by alleged victims of the bombings absent from earlier rounds of litigation—offer no occasion to unsettle those conclusions.

One dimension of this case, however, is new: how the plaintiffs experienced the bombings.[2] Unlike the victims who have already recovered, many of the plaintiffs here were not at the embassies when the bombs detonated, nor are they family members of those who were. Instead, they were involved in some way with the response to and aftermath of the bombings. These plaintiffs contend they were psychologically injured by their later involvement, entitling them—and, through them, their family members—to recovery as victims of intentional infliction of emotional distress (IIED).

For the reasons that follow, the Court concludes that these plaintiffs—"non-present victim-plaintiffs"—may not recover for IIED under the Foreign Sovereign Immunities Act.

**Factual Background**

Litigation over these embassy bombings has spanned the past two-plus decades and many case captions. Because numerous opinions thus recount the facts in detail, this one will recite a truncated version. See, e.g., Owens, 826 F. Supp. 2d at 135–46; Opati v. Republic of Sudan, 60 F. Supp. 3d 68, 72–75 (D.D.C. 2014).

---

[2] Although for convenience the Court will refer to "the case" singular, this matter is composed of three related cases. See Ratemo v. Islamic Republic of Iran, Civ. A. No. 19-2067 (JDB) (D.D.C. filed July 11, 2019); Katana v. Islamic Republic of Iran, Civ. A. No. 19-2068 (JDB) (D.D.C. filed July 11, 2019); Bushnell v. Islamic Republic of Iran, Civ. A. No. 22-646 (JDB) (D.D.C. filed Mar. 9, 2022). The three cases have not been formally coordinated or consolidated, but they concern the same attacks, involve the same counsel, and have proceeded in tandem. The Court's description of the case generally refers to all three cases together. Unless otherwise noted, docket citations refer to the docket in Ratemo, Civ. A. No. 19-2067 (JDB). This opinion and the accompanying order will be filed on each docket.

The government of the Islamic Republic of Iran has a long history of supporting terrorist organizations, including al-Qaeda and Hezbollah. Owens, 826 F. Supp. 2d at 135. "Throughout the 1990s—at least—Iran regarded al Qaeda as a useful tool to destabilize U.S. interests." Id. In pursuit of that goal, Iran and its agent Hezbollah "provided substantial training and assistance to al-Qaeda," including technical training on "how to blow up buildings." Id. at 137–38.

For present purposes, that support culminated with two simultaneous and devastating bombings on August 7, 1998, when trucks exploded outside the United States embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. Id. at 132. It was a tragic day: the bombings "killed hundreds of people and injured over a thousand." Id.

Because "[s]upport from Iran and Hezbollah was critical to al Qaeda's execution" of the bombings, id. at 139, numerous cases have found Iran liable for the resulting carnage under the Foreign Sovereign Immunities Act (FSIA), see, e.g., id.; Kinyua v. Republic of Sudan, 466 F. Supp. 3d 1, 10 (D.D.C. 2020); Opati, 60 F. Supp. 3d at 74.

**Procedural Background**

The plaintiffs in these related cases filed suit in 2019 and 2022. Their identities vary. Some are immediate family members of people injured or killed when the bombs detonated. See, e.g., 2d Am. Compl. [ECF No. 41] ¶ 14. Those plaintiffs are not at issue here. The plaintiffs that are at issue are those (including family members) who initially alleged, without elaboration, that the bombings "injured" them and who sought damages for "severe emotional distress" but not for physical injuries. See, e.g., Compl. [Bushnell ECF No. 1] ¶ 12.

After Iran failed to appear, the clerk entered defaults. See Default [ECF No. 34]; Default [Katana ECF No. 35]; Default [Bushnell ECF No. 22]. The plaintiffs moved for default judgment, asking the Court to take judicial notice of its earlier opinions finding Iran liable for the bombings.

See Mot. for Default J. [ECF No. 35] at 3; Mot. for Default J. [Katana ECF No. 36] at 3; Mot. for Default J. [Bushnell ECF No. 23] at 3.  The Court denied the motions, noting deficiencies in the complaints and a lack of plaintiff-specific detail.  See Order [ECF No. 38].  The plaintiffs then amended their complaints to address the Court's concerns.  See 2d Am. Compl.; 2d Am. Compl. [Katana ECF No. 42] ("Katana 2d Am. Compl."); 2d Am. Compl. [Bushnell ECF No. 28].

Even after the amendments, the relationship of many of the IIED plaintiffs to the bombings remained unclear.  To take one example of many, one plaintiff alleged only that he was "an employee of the US Agency for International Development near the U.S. Embassy in Nairobi, Kenya at the time of the" bombing, and claimed that he and his ten family member co-plaintiffs were entitled to damages "for their loss of society and severe emotional distress suffered as a result."  Katana 2d Am. Compl. ¶ 15.  The complaint did not detail where any of these eleven plaintiffs—or the countless others with nearly identical allegations—were at the time of the bombings or how they experienced the bombings, if at all.

So the Court held a hearing, at which plaintiffs' counsel clarified that many of the plaintiffs were neither present at nor related to somebody present at the bombings.  See Order for Suppl. Br. [ECF No. 42] at 2. Instead, a group of the plaintiffs—whom the Court labeled "non-present victim-plaintiffs"—were "emotionally harmed by (for example) their experience providing first aid at the scene following the bombings or in witnessing the aftermath of the bombings."  Id. at 1–2.  The other plaintiffs were the non-present victims' family members.  Id. at 2.  Because the Court was uncertain about these plaintiffs' ability to recover for IIED, the Court ordered additional briefing on the issue.  Id.  In particular, the Court sought a "limiting principle" to prevent a potentially infinite class of plaintiffs from recovering for emotional injury after terrorist attacks.  Id.

4

The resulting brief explained that the non-present victim-plaintiffs "include first responders, those who guarded the first responders against secondary attacks during recovery and rescue efforts, and those who coordinated the recovery effort, all of whom faced—in varying degrees—the traumatic impact of the attack and the risk of secondary attacks." Suppl. Br. [ECF No. 43] at 3–4. For a limiting principle, the plaintiffs proposed recovery for emotional injuries "proximately caused by the terrorist attack at issue and directly experienced by the plaintiff," such as those that result from "participating in the recovery efforts or viewing the aftermath of an attack," id. at 4, 17 (citation omitted), but no recovery for emotional distress experienced "through the suffering of another," id. at 22.

The briefing did not ease the Court's concerns. By a rough count, this case involves some 180 non-present victim-plaintiffs. Order for Add'l Suppl. Br. [ECF No. 45] at 2. Add the derivative claims of their family members, and "the claims of as many as two-thirds of the roughly 3,000 plaintiffs in these cases . . . may turn on alleged emotional injuries to plaintiffs who were not in fact present at the time of the bombings." Id. at 2–3. And the ability of this large class to recover remained unclear: the cases the plaintiffs relied upon to reach their proposed limiting principle were "light on reasoning" and did little to justify the outcomes they reached. Id. at 3–4.

Given the Court's uncertainty, plus "the potential for plaintiffs' proffered approach to drastically expand the scope of potential liability under the FSIA's terrorism exception," the Court ordered additional supplemental briefing from the plaintiffs and invited the United States to file a statement of interest pursuant to 28 U.S.C. § 517. Id. at 7. It asked for positions on two questions. First, it asked whether "entitlement to damages for emotional distress under 28 U.S.C. § 1605A(c) should be assessed with reference to § 46 of the Restatement (Second) of Torts." Id. at 8. Second, it asked how the Restatement operates with regard to the non-present plaintiffs at issue, including

5

whether such plaintiffs are better categorized as "direct" victims under § 46(1) or indirect ones under § 46(2). Id.

The plaintiffs and the United States both filed briefs. See Add'l Suppl. Br. [ECF No. 46]; U.S. Statement of Interest [ECF No. 54]; Resp. to U.S. Statement of Interest [ECF No. 55] ("Resp."). They agreed on the first question: § 46 of the Restatement (Second) of Torts governs. Add'l Suppl. Br. at 3; U.S. Statement of Interest at 7. But they diverged on the second. The plaintiffs proposed that they are "direct" victims eligible for recovery under § 46(1) because, by witnessing the bombing's aftermath, they "personally experienced Defendants' extreme and outrageous conduct." Add'l Suppl. Br. at 13–14. The United States countered that only individuals "physically present at the scene of the bombings when they occurred" are direct victims eligible for recovery under § 46(1). U.S. Statement of Interest at 14.

The United States has the better of the argument.

**Analysis**

Under the FSIA, a foreign sovereign sued in United States courts enjoys "a presumption of foreign sovereign immunity." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 87 (D.C. Cir. 2002). But even as the FSIA grants immunity in the mine run of cases, it withdraws immunity through certain exceptions, "narrowly construed." Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1062 (D.C. Cir. 2024). Iran is sued here under the "terrorism exception," which permits Iran and other designated state sponsors of terrorism to be held liable "for personal injury or death" that was "caused by" an act of "extrajudicial killing" for which it provided material support. See 28 U.S.C. § 1605A(a)(1); see also id. § 1605A(c) (granting certain individuals a private right of action "for personal injury or death caused by" acts of terrorism).

6

An "extrajudicial killing" "cause[s]" a plaintiff's "personal injury or death" if the extrajudicial killing—here, the bombings—was the proximate cause of the plaintiff's death or injury. See Borochov, 94 F.4th at 1062 (citing Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). Proximate cause doesn't ask much: it "eliminates the bizarre," demanding only that the defendant's actions were a "substantial factor" in the sequence of events leading to the plaintiff's injury and that the injury was "reasonably foreseeable or anticipated as a natural consequence" of the actions. Owens, 864 F.3d at 794 (citation omitted).

Standing alone, that causation requirement would sweep in an enormous number of plaintiffs. Consider the emotional injury that terrorism causes. It is not "bizarre" to expect an act of terrorism to result in emotional distress even worldwide—think of 9/11. Indeed, the "intent to create maximum emotional impact, particularly on third parties, is terrorism's raison d'etre." Est. of Heiser v. Islamic Republic of Iran ("Heiser II"), 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (internal quotation omitted). So, without further limitation, an act of terrorism could "turn the American citizenry"—and more—"into a potential class of IIED plaintiffs." Id.

But the FSIA's text is not the only guide: "Substantive law also limits who is a proper claimant." Owens, 864 F.3d at 807. To sue under the terrorism exception, one must suffer "personal injury or death"—terms defined by substantive tort law. Id. It is by reference to that law that the FSIA ensures that "not every person who experiences emotional distress from a major terrorist attack—a universe that could be large indeed—can state a claim for IIED." Id. Only if a plaintiff can make out the elements of a substantive tort can she claim "personal injury" under the FSIA. Id.

In identifying relevant tort law principles, the FSIA instructs federal courts to "find the law, not to make it." Bettis v. Islamic Republic of Iran, 315 F.3d 325, 338 (D.C. Cir. 2003). Courts find the law in "well-established statements of common law," in particular "state reporters, the Restatement of Torts, and other respected treatises." Fraenkel v. Islamic Republic of Iran, 892 F.3d 348, 353 (D.C. Cir. 2018).

Accordingly, the agreement of the plaintiffs and the United States that the Court should interpret IIED liability in this context by reference to § 46 of the Second Restatement of Torts is unsurprising. That section "has traditionally guided this Court in deciding who has standing to recover [IIED] damages in FSIA § 1605A cases." Davis v. Islamic Republic of Iran, 882 F. Supp. 2d 7, 14 (D.D.C. 2012); see also Owens, 864 F.3d at 807; Bettis, 315 F.3d at 333.[3]

The second question is harder: applying the Restatement, can these non-present victim-plaintiffs recover for the emotional damage they suffered from experiencing an attack's aftermath?

Section 46 of the Restatement (Second) of Torts reads:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

      (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

      (b) to any other person who is present at the time, if such distress results in bodily harm.

---

[3] See also, e.g., Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 36 (D.D.C. 2018); Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311, 336 (D.D.C. 2014); Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 76 (D.D.C. 2010); Heiser II, 659 F. Supp. 2d at 26. The Court notes that the formal source of the substantive law used to assess tort claims varies with the identity of each plaintiff. Plaintiffs who are nationals of the United States, members of its armed forces, or its employees or contractors acting within the scope of their employment at the time of an attack enjoy a private right of action under 28 U.S.C. § 1605A(c). Such plaintiffs "need not rely upon state tort law," Owens, 864 F.3d at 809, and instead rely on the general principles of tort law that courts "find" in sources like the Restatement, Bettis, 315 F.3d at 333. Plaintiffs who do not have a private right of action under § 1605A(c) may sue under District of Columbia law. Owens, 826 F. Supp. 2d at 155. Because the District of Columbia follows § 46 of the Second Restatement, Republic of Sudan v. Owens, 194 A.3d 38, 41 (D.C. 2018), the question reduces either way to the application of the Restatement.

The provision thus divides into two parts, with § 46(1) governing claims by those at whom the extreme and outrageous conduct was directed and § 46(2) governing claims by third persons at whom the conduct was not directed. See Republic of Sudan v. Owens, 194 A.3d 38, 41 (D.C. 2018); Bettis, 315 F.3d at 334 ("§ 46(1) is limited to direct (not 'third party') actions").

The most natural application of § 46(1)—the direct victims provision—to the bombing context is that a bombing is "directed at" those within the bomb's blast radius, i.e., the area physically affected by the explosion itself. On that straightforward understanding, the bombings here were not "directed at" the non-present victim-plaintiffs.

The plaintiffs nonetheless seek coverage under § 46(1). They argue that they are direct victims because the terrorists intended to harm them emotionally and because they experienced the effects of the bombing "firsthand." See Resp. at 13. A plaintiff experienced the conduct firsthand, they posit, if he was a "first responder[]," "guarded the first responders against secondary attacks," "coordinated the recovery effort," or "view[ed] the aftermath of an attack." Suppl. Br. at 3–4; see also id. at 17.[4]

This attempt to squeeze the non-present plaintiffs into § 46(1) fails. The plaintiffs' first proposed qualification for "direct" victim status—that the attackers intended to harm them emotionally—does no limiting work, as "intent to create maximum emotional impact, particularly on third parties, is terrorism's raison d'etre." Heiser II, 659 F. Supp. 2d at 27; see also Owens, 864 F.3d at 811 ("[T]errorist bombings typically target the public at large in order to create a general environment of fear and insecurity."). Since the bombings here do not differentiate among

---

[4] The plaintiffs also suggest that individuals might be able to recover for emotional distress stemming "from losing colleagues," Suppl. Br. at 21, but that category of plaintiffs cannot recover even under their own proposed rule, which rejects claims based on "anguish over the tragic loss" of colleagues, Ayres v. Islamic Republic of Iran, Civ. A. No. 18-265 (RCL), 2022 WL 1438605, at *11 (D.D.C. May 3, 2022); see Suppl. Br. at 15, 17.

9

members of the public in whom fear would be instilled, all would be potential plaintiffs. Cf. Owens, 864 F.3d at 811 (noting that the "[w]idespread distress" from terrorist bombings provides "a considerably weaker basis for IIED liability" than distress "inflicted upon specific third parties").

Meanwhile, the plaintiffs' second qualification—that they experienced the bombing's impact "firsthand"—makes a jumble of the Restatement. To see why, look at the third-person provision of § 46. That provision, § 46(2), incorporates a firsthand requirement into its standard: it requires the third person to have been "present at the time" of the extreme and outrageous conduct. Restatement (Second) of Torts § 46(2)(a), (b). Said differently, a third person may only recover for IIED if she suffers emotional distress due to her own experience of extreme and outrageous conduct because she was "present and perceive[d]" the extreme and outrageous conduct "as it happen[ed]." Owens, 194 A.3d at 42. The presence requirement thus enacts a general principle of tort law that a plaintiff may not "complain[] of harm flowing merely from the misfortunes visited upon a third person," Holmes v. Secs. Inv. Prot. Corp., 503 U.S. 258, 268–69 (1992), and thereby "prevents excessive liability while affording relief to plaintiffs who suffer a uniquely traumatic experience," Owens, 194 A.3d at 42.

If anybody with firsthand experience of extreme and outrageous conduct were a direct victim of the conduct, § 46(1) would swallow § 46(2) whole. It cannot be, in other words, that extreme and outrageous conduct is "directed at" anybody who experiences the effects of that conduct firsthand, because such a rule would leave no third-person plaintiffs to proceed under § 46(2). Cf. Bettis, 315 F.3d at 334 (condemning an interpretation of § 46(1) that "would undermine the limitations imposed on recovery under § 46(2)").

To their credit, the plaintiffs don't, in the main, contest that they must have been present to recover under § 46(1). Instead, they attempt to stretch the temporal and geographic scope of the event at which they must have been present. As they point out, the impact of a bombing "does not end the instant in which the bombs explode[]." Resp. at 8. Carnage and wounds linger, and injured victims may die days, weeks, or longer after the attack itself. Plus, injured victims go elsewhere—to hospitals, for instance—and thereby (in a manner of speaking) directly expose many more people to an attack's effects. Because those effects continue long after and far beyond the attack itself, the plaintiffs posit, it is enough that they were present at some point to witness the effects "firsthand." See id. at 6–8.

This maneuver fails for the same reason, and again has virtually no limits. Section 46(2) requires "presen[ce] at the time" of the extreme and outrageous conduct. Restatement (Second) of Torts, § 46(2). Section 46(1) must (as a general matter) expect the same if § 46(2) is not to be rendered superfluous. The plaintiffs' emphasis on an attack's lingering effects is nothing more than an attempt to sweep into the FSIA every injury of any stripe that proximately results from an act of terrorism, without regard to the principle that "[s]ubstantive law also limits" FSIA recovery. Owens, 864 F.3d at 807. The question in any FSIA case is not whether a plaintiff has suffered any harm but whether she has suffered a tort, for it is only by reference to the substantive law of torts that the FSIA defines "personal injury." Id. And the law of torts, as explained above, does not recognize the emotional impact of an attack's aftermath as a basis for IIED.

It is worth acknowledging that § 46(2)'s presence requirement is not an absolute one. But, in this Court's view, the exception proves the rule. Recognizing the unique impact that terrorism has on victims' immediate family members, many courts in this Circuit and elsewhere permit immediate (but non-present) family members to recover for the emotional damage they suffer as

11

a result of terrorist attacks targeting their loved ones. See Owens, 864 F.3d at 810 & n.6 (noting that "[s]everal district courts have" permitted non-present family members to recover for emotional distress resulting from terrorist attacks). Whether framed in terms of absent family members constructively "satisfy[ing] the presence requirement," Kinyua, 466 F. Supp. 3d at 9, or being exempt from it, Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 42–43 (D.D.C. 2007), abrogated on other grounds by Mohammadi v. Islamic Republic of Iran, 782 F.3d 9 (D.C. Cir. 2015), the result is the same: immediate family members of victims may recover for acts of terrorism they did not experience themselves.[5]

But the loosening of the presence requirement has accompanied a tightening of the family requirement. "[S]ome lines must be drawn," and courts have chosen to draw them "with respect to family relationship (and not presence)." Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 36 (D.D.C. 2001); see also Davis, 882 F. Supp. 2d at 15 ("In the terrorism context, this Court has strictly interpreted § 46(2)(a)'s 'immediate family' requirement while loosely interpreting its 'presence' requirement."); Bettis, 315 F.3d at 331. And the strict family requirement has gone a long way towards making courts comfortable flexing the presence requirement. The D.C. Court of Appeals, for instance, reasoned that allowing absent family members to recover for IIED "should not open the floodgates to litigation" because the remaining elements of § 46(2)(a)— including the immediate family requirement—ensure that the exception "is quite limited in scope."

---

[5] Some decisions suggest that absent family members may recover under § 46(1) rather than § 46(2) because "a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families." Peterson, 515 F. Supp. 2d at 44 n.13 (internal quotation marks omitted); Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005). But most decisions—even those that use the "directed at" language—place absent family members in the § 46(2) bucket. See, e.g., Ewan, 466 F. Supp. 3d at 245–46; Owens, 194 A.3d at 45 & n.8; Cabrera v. Islamic Republic of Iran, Civ. A. No. 19-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). The Court agrees that family members are best thought of as recovering under § 46(2), but the distinction is academic in this case. Either way, immediate family members get a pass on the presence requirement. As explained here, however, if everyone—family or not—got a pass on the presence requirement there would be little left to limit the scope of recovery.

12

Owens, 194 A.3d at 44; see also id. at 43 ("[T]he risk of trivial or feigned claims is exceedingly low when the anguish derives from a terrorist attack that killed or injured a member of the plaintiff's immediate family."); Est. of Heiser v. Islamic Republic of Iran ("Heiser I"), 466 F. Supp. 2d 229, 328–29 (D.D.C. 2006).

The further loosening of the Restatement's requirements contemplated here has no such limits. These non-present victim-plaintiffs are not family members of people at the scene of the bombing, and no comparable qualification limits their ability to recover. Indeed, many of the plaintiffs in this case are themselves family members of the non-present victim-plaintiffs— meaning that they seek to escape the presence requirement to recover derivatively for the distress of "direct" plaintiffs who themselves seek to escape the presence requirement. Of the "two qualifications" "limit[ing]" the scope of recovery for IIED—the presence requirement and the immediate family requirement—many courts have eliminated the first so long as the second remains. Kinyua, 466 F. Supp. 3d at 9. The plaintiffs would eliminate the second. Rather than abide the limitations holding the floodgates closed, then, the plaintiffs' position would invite IIED claims from a substantially expanded class of individuals, including those who were neither present at, nor related to somebody present at, an attack.

In sum, the Restatement permits IIED awards for targets of "extreme and outrageous conduct" (§ 46(1)) and certain witnesses of it (§ 46(2)). In the context of a terrorist bombing, an individual is a target and thus eligible for recovery under § 46(1) if she was within the bomb's blast radius. Individuals "absent from the scene" of a bombing were "not target[ed]" by the bombing and can only recover, if at all, under § 46(2) as third-person plaintiffs. See Owens, 194 A.3d at 43; see also id. at 45 & n.8 (concluding that absent family members may recover under § 46(2) but are not direct victims under § 46(1)). The Restatement simply does not permit IIED

awards for those who witness only the aftermath of a terrorist attack, sympathetic though their distress may be.

The Court recognizes that this position might effectively mean that, in the terrorist bombing context, one must suffer the tort of assault or battery to suffer the tort of IIED. See Resp. at 9–11 (making this point). At minimum, somebody present at the scene of a bombing will fear physical harm—i.e., "an immediate apprehension of" a "harmful or offensive contact"—that the perpetrator undoubtedly intended to cause and did cause. Restatement (Second) of Torts § 21 (defining assault). The plaintiffs make much of this consequence, see Resp. at 9–11, but the Court is unconcerned for three reasons. For one, there is no rule that every wrongful act must produce neat categories of victims who have suffered each tort and only that tort. For another, this consequence does not mean that IIED will play no role in FSIA cases seeking accountability for terrorist bombings: as discussed above, it has become commonplace for absent family members to recover for the emotional distress they suffer from afar. And finally, this consequence is specific to the bombing context. Other sorts of "extrajudicial killing[s]"—not to mention, say, "torture" or "hostage taking," see 28 U.S.C. § 1605A(a)(1)—may not result in such complete overlap between those who witness an act of terrorism and those who fear immediate physical harm from it.

For that matter, other bases for invoking the terrorism exception could present such different circumstances that the reasoning in this opinion may not apply. Unique contexts might make direct victims harder to identify. Consider a hostage-taker who makes demands of a faraway person in exchange for the hostage's release. Though absent, the faraway person might properly be considered a "direct target" of the hostage taking, because the entire point of taking the hostage is to extract concessions from that person. See Owens, 864 F.3d at 810–11 (discussing this scenario). "If so, the plaintiff's contemporaneous physical presence is not required because the

14

plaintiff is the direct target of the tortious conduct, rather than a mere bystander." Id. at 811. "In contrast, a terrorist bombing is not so precisely targeted at certain absent individuals"—it is targeted at those present. Id.; see also Owens, 194 A.3d at 45 n.8. This opinion, then, does not conclude that § 46(1) invariably requires presence. It concludes simply that the plaintiffs' proposed rule—that anybody who experiences (at any time) the effects of conduct "firsthand" qualifies as a direct victim—is untenable, and that the bombing context presents no need to stray from the straightforward application of § 46.

The comparison to the hostage context also helps dispense with the plaintiffs' strongest rejoinder to the Court's reading of § 46. That rejoinder derives from an example in the Restatement suggesting that somebody who encounters the aftermath of extreme and outrageous conduct need not witness the conduct itself to recover for IIED so long as the tortfeasor "desires to inflict severe emotional distress" and "knows that such distress is certain, or substantially certain, to result," or where he acts recklessly "in deliberate disregard of a high degree of probability" that such distress will result. Restatement (Second) of Torts § 46, cmt. i. The example reads:

> During A's absence from her home, B attempts to commit suicide in A's kitchen by cutting his throat. B knows that A is substantially certain to return and find his body, and to suffer emotional distress. A finds B lying in her kitchen in a pool of gore, and suffers severe emotional distress. B is subject to liability to A.

Id. And, the example continues, the same result obtains if B suspects to "a high degree of probability" rather than "know[s]" that A will find him. Id. As the plaintiffs point out, the perpetrators of a bombing no doubt intend, or at least recklessly disregard the probability, that the bloody aftermath of an attack will traumatize those who see it. So they analogize the non-present victim-plaintiffs to A, who was absent from the suicide attempt but nonetheless may recover IIED damages for the emotional injury he suffered upon his return. Add'l Suppl. Br. at 12.

15

It is a forceful argument, but it cannot overcome the plain implication of § 46 itself. In this idiosyncratic example, B's conduct "mo[st] directly targeted" A, see Bettis, 315 F.3d at 335—indeed, there was no other target, as the Restatement speaks of extreme and outrageous conduct directed "at another," see § 46(1). "In contrast, a terrorist bombing is not so precisely targeted at certain absent individuals." Owens, 864 F.3d at 811. Such a bombing instead is precisely targeted at present individuals: those killed, injured, or within the blast radius. In the bombing context, then, there is no need to look elsewhere for the conduct's direct victims.

The plaintiffs rightly point out that this conclusion breaks from a few district court cases that involve analogous plaintiffs. These cases have generally awarded damages for emotional distress resulting from "participat[ing] in the recovery efforts" following a terrorist attack, Ayres v. Islamic Republic of Iran, Civ. A. No. 18-265 (RCL), 2022 WL 1438605, at *6, *11 (D.D.C. May 3, 2022), or, sometimes, from "view[ing] the aftermath" of an attack, Relvas v. Islamic Republic of Iran, Civ. A. No. 14-1752 (RCL), 2018 WL 1092445, at *3–4 (D.D.C. Feb. 28, 2018).[6] And, the plaintiffs add, some non-present victim-plaintiffs recovered in the earlier rounds of litigation over these same embassy bombings, albeit without scrutiny. See Suppl. Br. at 5–7.

Maybe so. But why compound the error? These cases offer no rationale for the rules they applied and therefore have minimal persuasive value. The oversight is understandable; the cases generally involved a couple of absent plaintiffs at most, and those plaintiffs' ability to recover was

---

[6] See also Davis, 882 F. Supp. 2d at 13 (awarding IIED damages to a servicemember who was stationed elsewhere "but participated extensively in the rescue operations"); Order at 1, Est. of Fishbeck v. Islamic Republic of Iran (Dec. 1, 2023) (Civ. A. No. 18-2248 (CRC)) [ECF No. 148] ("[T]he Court finds that the Foreign Sovereign Immunities Act allows claims for certain direct personal injuries caused as a result of participating in the recovery efforts or viewing the aftermath of an attack."). Cf. Ewan, 466 F. Supp. 3d at 241, 248 (awarding IIED damages to servicemember who was "not in the immediate vicinity of the bombing" but "was less than half a mile away," "rushed to the scene and saw the carnage firsthand," and may have suffered hearing loss resulting from the bomb blast); Ackley v. Islamic Republic of Iran, Civ. A. No. 20-621 (BAH), 2022 WL 3354720, at *10, *26 (D.D.C. Aug. 12, 2022) (awarding damages to servicemember who was "near" the bombing, "heard and felt the explosion," and "witnessed the death and destruction in its wake" the next day, as well as one who saw the "mushroom cloud" from a bomb and "searched buildings for any signs of life" (cleaned up)).

generally not put in controversy—certainly not before this Court. By contrast, "the claims of as many as two-thirds of the roughly 3,000 plaintiffs in these cases—the 180-some 'direct' plaintiffs plus family members bringing derivative claims based on their injuries—may turn on alleged emotional injuries to plaintiffs who were not in fact present at the time of the bombings." Order for Add'l Suppl. Br. at 3. The non-present victim-plaintiffs here are no afterthought, but rather the meat of the case.

Perhaps most importantly, these earlier cases offer no limiting principle. Why compensate injuries from viewing the aftermath of an attack but not, for example, from viewing it live on television? Or from hearing about it the next day? The Bettis Court warned against a rule that would logically permit "millions of people who are not present" but who "watch the torture or murder of the President on television" from recovering for emotional distress. 315 F.3d at 331 (internal quotation marks omitted). The plaintiffs' proposed rule here does no better; their insistence that they may recover because they experienced an attack's downstream effects "firsthand" is not grounded in any principle but rather is plucked from a handful of district court cases that did not substantively engage with the issue. See, e.g., Order at 1, Est. of Fishbeck v. Islamic Republic of Iran (Dec. 1, 2023) (Civ. A. No. 18-2248 (CRC)) [ECF No. 148]. By contrast, today's result derives directly from the Restatement—where the Court has been directed to "find the law," mindful of its responsibility "not to make it." Bettis, 315 F.3d at 338.

## Conclusion

For the above reasons, the Court concludes that only individuals within the blast radius of the bombings qualify as direct victims under § 46(1) of the Restatement (Second) of Torts. Non-present victim-plaintiffs cannot recover for IIED under the FSIA. The Court will therefore direct

the plaintiffs to identify the specific plaintiffs seeking recovery consistent with the framework outlined in this opinion.

/s/<br>JOHN D. BATES<br>United States District Judge

Dated: January 24, 2025